GERALD SINGLETON (SBN 208783)
BRODY A. McBRIDE (SBN 270852)
SINGLETON LAW FIRM, APC
115 West Plaza Street
Solana Beach, CA  92075
Tel:    (760) 697-1330
Fax:    (760) 697-1329
Email:   gerald@geraldsingleton.com
             brody@geraldsingleton.com

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| CHRISTINA DORSEY,<br><br>Plaintiff,<br><br>v.<br><br>CITY OF SAN DIEGO, SAN DIEGO POLICE DEPARTMENT, CHIEF SHELLEY ZIMMERMAN, SERGEANT CEPHAS, OFFICER PONCE, OFFICER ESQUER, OFFICER HERNANDEZ, OFFICER HENDEE, OFFICER ANDERSON, OFFICER ST. CLAIR,<br><br>Defendants. | Case No. **'15CV1441 L     WVG**<br><br>**COMPLAINT FOR DAMAGES**<br><br>**JURY TRIAL DEMAND** |

## INTRODUCTION

1.      Plaintiff is a young woman who, in the early morning hours of July 20, 2014, was beaten and jailed by San Diego Police Department ("SDPD") officers after declining to engage in a consensual encounter.

//

2.     Having just returned from a trip to Mexico with her friends, Plaintiff was sitting calmly in the front passenger's seat of a parked car when SDPD officers arrived to investigate a domestic violence dispute.

3.     Plaintiff fit the description of neither suspect nor victim.  Nonetheless, for unknown reasons, SDPD officers insisted that Plaintiff exit the car she was sitting in. When Plaintiff declined, one SDPD officer, a large male, put his hands on the slight-framed, 130 pound, 20-year-old Plaintiff.  More specifically, he twisted Plaintiff's wrist into a "pain compliance" hold and began to pull Plaintiff out of the car.  Given recent cases of sexual assault by SDPD officers against women citizens, the disproportionate use of force by police everywhere against black citizens, and the fact that she had done nothing except invoke her rights to decline to interact with SDPD officers during a consensual encounter, Plaintiff was understandably alarmed.

4.     Fortunately, another officer who was already on the scene approached, saying the suspect had already been identified, that Plaintiff was merely a friend of the suspect, and that the officer who grabbed Plaintiff should let go of her.  The officer then let go of Plaintiff, placed Plaintiff under guard, and left to arrest the actual suspect.

5.     Astoundingly, after arresting the actual suspect, the officer who grabbed Plaintiff returned to resume his harassment of Plaintiff.  He again insisted that Plaintiff exit the vehicle without explanation.  Plaintiff asked the officer why he wanted her to exit; when the officer ignored her question, and refused to give Plaintiff a reason why she needed to get out of the car, Plaintiff refused to exit the vehicle.  Another officer insisted that Plaintiff exit the vehicle.  When Plaintiff asked this officer why he was demanding that she exit, he also ignored her question.  Not understanding what was happening, and why the officers were telling her to exit the vehicle, Plaintiff again refused to exit the vehicle.

6.     Ultimately, three large, male officers physically grabbed  Plaintiff and pulled her from the car.  These officers slammed Plaintiff facedown into the ground. They pressed their knees into Plaintiff's back.  They used their fists to punch Plaintiff's

legs.  They did all of this because Plaintiff declined to participate in a consensual encounter.

7.    The officers then arrested Plaintiff without telling her why she was under arrest.  They then transported her to a booking sub-station, where, unfortunately, the SDPD's abuses of her did not stop.  When Plaintiff complained about the violation of her civil rights, and alleged, inter alia, that the SDPD's brutal conduct toward her was racially motivated, an SDPD sergeant ordered Plaintiff to be placed in maximum restraints in retaliation.  In hog-tying Plaintiff, the SDPD officers used the opportunity to punch Plaintiff three more times.

8.    The SDPD officers then filed false reports and requested that the San Diego District Attorney's office file false, non-meritorious charges against Plaintiff.  Plaintiff refused to plead guilty to these false charges, and she was ultimately acquitted by a jury.

9.    None of this would have happened if SDPD officers had respected Plaintiff's legal right <u>not</u> to participate in a consensual encounter.  Unfortunately, Plaintiff's experience is not unique.  Indeed, Plaintiff's injuries are consistent with a pattern or custom of unconstitutional practices that persists among law enforcement agencies in San Diego, including the SDPD, and that generally involves officers illegally detaining and physically abusing citizens based on hunches or personal prejudices, followed by the pressing of false charges in an effort to cover up for the officers' misconduct.  Accordingly, Plaintiff brings suit under 42 U.S.C. § 1983 to seek redress for the violation of her constitutional rights and for the injuries and damages she sustained.

**JURISDICTION AND VENUE**

10.    The Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343, as Plaintiff asserts causes of action arising under 42 U.S.C. § 1983.

11.    The Court has personal jurisdiction over all Defendants in this action, as all Defendants are domiciled in the State of California.

12.     Pursuant to 28 U.S.C. § 1391, venue is proper in this District, as the events giving rise to this action occurred in the City of San Diego, California, in the County of San Diego, which is located within the Southern District of California.

## **PARTIES**

13.     Plaintiff Christina Dorsey ("Plaintiff") is a United States citizen who, at all times relevant hereto, was domiciled in California.

14.     Defendant City of San Diego ("City") is a municipal entity duly organized under California law.

15.     Defendant the San Diego Police Department ("SDPD") is the chief law enforcement agency for the City.

16.     Defendant Shelley Zimmerman ("Chief Zimmerman"), an individual domiciled in California, was, at all times relevant hereto, the Chief of the SDPD and, as such, a final policymaker for both the SDPD and the City under California law.

17.     Defendant Sergeant Cephas ("Sgt. Cephas"), an individual domiciled in California, was, at all times relevant hereto, a sergeant and/or officer of the SDPD.

18.     Defendant Officer Ponce (ID # 6859), an individual domiciled in California, was, at all times relevant hereto, an officer of the SDPD.

19.     Defendant Officer Esquer (ID # 7089), an individual domiciled in California, was, at all times relevant hereto, an officer of the SDPD.

20.     Defendant Officer Hernandez (ID # 6588), an individual domiciled in California, was, at all times relevant hereto, an officer of the SDPD.

21.     Defendant Officer Hendee (ID # 6588), an individual domiciled in California, was, at all times relevant hereto, an officer of the SDPD.

22.     Defendant Officer Anderson (ID # 6831), an individual domiciled in California, was, at all times relevant hereto, an officer of the SDPD.

23.     Defendant Officer St. Clair (ID # 7108), an individual domiciled in California, was, at all times relevant hereto, and officer of the SDPD.

//

24.     With the exception of Chief Zimmerman, who is sued in her official capacity only, all individual defendants are sued in their individual capacities.

25.     Plaintiffs are informed and believe, and thereon allege, that, at all times relevant hereto, Defendants were each the agents, joint-venturers, servants, and/or employees of each other, and in doing the things alleged, were acting within the scope of their agency, venture, service, and/or employment and with the permission of each other. Plaintiffs are informed and believe that each Defendant was responsible in some way for the harms alleged herein.

26.     At all times relevant hereto, Defendants were acting under color of state law, including, for example, by acting in according with the statutes, ordinances, regulations, policies, customs, and practices of the State of California, the City, and/or the SDPD.

## FACTS

27.     On July 20, 2014, around 5:00 a.m., Officer Ponce responded to a report of domestic violence in the parking lot at 4570 Camino de la Plaza in San Diego, California.  Officer Hendee, Officer Anderson, Officer St. Clair, Officer Hernandez, and Officer Esquer also responded.  SDPD dispatch identified the suspect as a black female, 21-years-old, and wearing a <u>white</u> dress.  The victim of the alleged assault was described as a black male who had been drinking.

28.     When he arrived at the scene, Officer Hendee did not, as evidenced by his actions, communicate with any the other SDPD officers, including Officer Ponce, who were already on the scene.

29.     Officer Hendee claims he first saw Plaintiff sitting alone in a vehicle in the front passenger seat facing toward the officer.  Plaintiff's demeanor was calm, and she was wearing a <u>multi-colored</u> dress that could not have been mistaken for a white dress. No 21-year-old, black female wearing a white dress, or black male who had been drinking, was in sight.  Officer Hendee claims Plaintiff was trying to avoid eye contact with him and was acting "irritated" that he was there.

30.     Officer Hendee claims he asked a nearby "toll desk" worker if Plaintiff was part of the domestic violence incident that had been reported to police.  The worker allegedly pointed to Plaintiff and said, "Yeah, she's yelling at a guy."  Conveniently, Officer Hendee does not identify this worker in his report, even though this eye witness's purported identification of Plaintiff is the only particle of evidence –other than Plaintiff being a young, black woman in the vicinity of the incident –that linked Plaintiff to the report of domestic violence.

31.     Officer Hendee claims he next saw Officer Ponce, who had also responded to the scene, and noted that Officer Ponce was speaking to a person whom Officer Hendee believed to be the victim, and that Plaintiff must have been the suspect who was sitting inside the vehicle.  Officer Hendee did not bother to confirm any of these beliefs in what was, at this point, a non-volatile situation.

32.     Instead, Officer Hendee opened the car door.  Plaintiff did not respond. Officer Hendee asked Plaintiff for her name and she allegedly replied, "You can't open my car door; I know my rights."[1]

33.     Officer Hendee claims he informed Plaintiff that he was investigating a domestic violence call that possibly occurred in the parking lot and that she matched the suspect's description.  Officer Hendee claims Plaintiff told him she did not know what he was talking about and to go away.  Officer Hendee asked how old she was and Plaintiff allegedly responded, "20."  Officer Hendee claims he told Plaintiff he could smell the odor of alcohol and that she was under age.  Officer Hendee did not, however, report that he observed any evidence that Plaintiff had control of the vehicle in which she was sitting, that she was drunk in public, or that she was unable to care for herself.

---

[1] It is a sad truism in the United States that members of minority groups, particularly young people, assert their rights with a police officer at their own risk.  Officers regard "contempt of cop", which is the failure to give offices the deference to which they believe they are entitled, as a very serious offense.  In response to "contempt of cop", officers frequently impose "street justice" (consisting of physical violence and/or false arrest) on individuals who have the temerity to assert their rights and refuse to comply with the officer's wishes.

34.     The description Officer Hendee had from SDPD dispatch regarding the suspect was that the suspect was a 21-year-old, black female wearing a white dress.  At this point, Officer Hendee knew Plaintiff was black, 20-years-old, wearing a multi-colored dress that could not be confused with a white dress, and that Plaintiff had been sitting calmly in the car since Officer Hendee first saw her.  In spite of these facts, Officer Hendee alleged in his report that Plaintiff fit the description of the domestic violence suspect.

35.     Officer Hendee claims he next asked Plaintiff to step out of the vehicle and that she refused.  Officer Hendee claims he asked Plaintiff again to step out of the vehicle and that Plaintiff responded, "No, I don't have to step out because I know my rights."  Officer Hendee claims he asked Plaintiff ten more times to step out of the vehicle and that, each time, Plaintiff responded, "Why?"  Officer Hendee claims he explained to Plaintiff why he wanted her to get out of the vehicle (not surprisingly, Officer Hendee fails to mention this reason in his report).  Officer Hendee claims Plaintiff continued to refuse to get out of the car.

36.     Again, the SDPD officers here, including Officer Hendee, were responding to a radio call of "possible domestic violence."  Yet, Officer Hendee's arrest report does not establish that he was in fact aware that domestic violence had, in fact, taken place – much less that Plaintiff was involved in any incident of domestic violence.  Indeed, none of the police reports articulate any facts that would give rise to the reasonable suspicion, or probable cause, necessary to support Plaintiff's detention or arrest.  In short, the totality of these circumstances demonstrates that the SDPD officers here had cause to engage only in a consensual encounter, and that Plaintiff therefore had the right to decline participation.  These facts make it clear that Officer Hendee's treatment of Plaintiff was based on a hunch at best, and some personal animus – or racial prejudice – at worst.

37.     Officer Hendee reported that Officer St. Clair next arrived on scene. Officer St. Clair allegedly told Plaintiff to step out of the vehicle as well.  The officers

reported that Plaintiff then called them racist.  Officers are supposed to be trained <u>not</u> to engage in retaliatory conduct based upon remarks made to them by citizens.  To the extent these SDPD officers retaliated against Plaintiff for calling them racist, the officers were either untrained or failed to follow their training.  While officers may take exception to being called racist, this language is not by itself illegal and is certainly not cause to engage in an improper detention and/or use of force. Rather it is the kind of behavior which constitutes "contempt of cop", a "crime" which, while regarded as being <u>very</u> serious by law enforcement officers, is not found in the California Penal Code[2].

38.     Officer Hendee reported that he next took control of Plaintiff's right wrist and attempted to remove her from the vehicle with a controlled wristlock, which is a pain compliance hold.  At the time Officer Hendee used this force against Plaintiff, however, no reasonable suspicion to justify detaining her existed.  Accordingly, any force by Officer Hendee was excessive and, a violation of Plaintiff's rights under the Fourth Amendment.

39.     Officer Hendee reported that Plaintiff pulled away from him and used her feet against the car to prevent him from pulling her from the vehicle.  Officer Hendee claims in his report that he then released his grip to prevent injuring Plaintiff until more units were there to assist him.  In reality, Officer Ponce had approached Officer Hendee and told him to let go of Plaintiff.  Officer Ponce told Officer Hendee that Plaintiff was not the suspect (as Officer Ponce had already identified and detained the actual suspect), that Plaintiff was the suspect's friend, and that Plaintiff was sitting in the suspect's car.[3]

40.     Officer Hendee reported that once he released his hold on Plaintiff, Plaintiff became verbally irate and again claimed the officers were motivated by racial prejudice.

---

[2]  While Penal Code § 148 (and, with increasing frequency, Penal Code § 69) is frequently used to punish those whom officers consider to be in "contempt of cop", this is not its legal definition.

[3]  It is odd that these officers would not have communicated to one another over their radios that the suspect had been detained.  Indeed, had such a communication occurred, it seems likely Officer Hendee's encounter with Plaintiff would have ended much sooner than it did.

41.     Officer Hendee reports that he next asked Plaintiff for her identification card, which she provided.  Officer Hendee then told Officer St. Clair to stay with Plaintiff until Officer Hendee could return from speaking with the actual suspect and the alleged victim.

42.     Officer St. Clair agreed to stand guard over Plaintiff, thereby continuing Plaintiff's detention <u>after</u> it had been confirmed that she was not involved in the domestic violence incident.  Because no reasonable suspicion existed to justified this continued detention, this was another violation of Plaintiff's Fourth Amendment rights.[4]

43.     After arresting the person(s) associated with the domestic violence call, Officer Hendee returned to Plaintiff's location to continue questioning her regarding alcohol use.  Plaintiff told Officer Hendee she had not been drinking.

44.     Officer Hendee reported that an unidentified male then returned to the scene and was later identified as the registered owner of the vehicle in which Plaintiff was seated. After determining that this unidentified male was intoxicated, Officer Hendee claims he got permission from this unidentified male to park and lock the vehicle in the parking lot.

45.     Officer Hendee claims he then returned to the vehicle where Plaintiff was still seated.  Officer Hendee claims he then told Plaintiff to exit the vehicle,, and that Plaintiff again refused.

46.     The officers' reports then indicate that Officer Anderson then grabbed Plaintiff's right arm, Officer Hendee grabbed Plaintiff's left arm, and they pulled her from the vehicle.  The officers claim Plaintiff began kicking and that Plaintiff kicked Officer Anderson's leg; however, the officers do not claim that Anders was injured.

47.     Officer Anderson next placed Plaintiff into a headlock.  Officers Ponce and

---

[4]  So that the record is clear, the entire detention was illegal because the Defendant SDPD officers <u>never</u>, at any point during their encounter with Plaintiff, had reasonable suspicion to justify detaining her.  However, even if reasonable suspicion to detain her had existed, it would disappear as soon as the officers' knew Plaintiff was not the suspect.  Since they clearly knew that as this point, no further detention of Plaintiff was permitted at this point.

Hendee grabbed Plaintiff's arms, and all three slammed Plaintiff facedown on the ground.  The officers plunged their knees into Plaintiff's back and began punching her. Officer Hendee put handcuffs on Plaintiff, and Officers Anderson and Hendee finally stood a battered Plaintiff up onto her feet.

48.     Given that Plaintiff stands approximately 5 feet 3 inches, and weighed approximately 130 pounds, this use of force by the three, much larger and stronger officers was completely out of proportion for the circumstances.  Even if Defendants would have been legally entitled to use force against Plaintiff, which they were not, the amount of force they used was grossly excessive and reckless.  A single misplaced punch could have driven Plaintiff's skull or spine into the pavement, killing or paralyzing her instantly.  And for what?  Because Plaintiff chose not to engage in a consensual encounter?

49.     These SDPD officers claim they then informed Plaintiff she was under arrest for resisting arrest with violence and for battery on a police officer, California Penal Code sections 69 and 243(b).  In truth, the Defendant SDPD officers did not inform Plaintiff of her charges; they continued to ignore Plaintiff's questions.

50.     Plaintiff was transported to a SDPD booking sub-station where she was escorted into a holding cell with her hands still cuffed behind her back.  Officer Hendee claims that, while he was completing the booking paperwork, Plaintiff continued yelling at officers, insisting they were racist.  Officer Hendee claims Plaintiff stepped onto a bench seat in the holding cell with her hands still handcuffed behind her back and the officers allegedly feared she would harm herself if she fell to the ground with her hands cuffed behind her back.

51.     Sgt. Cephas claims he entered the holding cell and told Plaintiff to sit on the bench or she was going to be maximally restrained to prevent her from causing injury to herself.  Sgt. Cephas claims Plaintiff said, "I don't care; maximum restrain me."  Sgt. Cephas ordered maximum restraints be applied.  Plaintiff was therefore hogtied in the prone position, and Officer Hendee took the opportunity to punch Plaintiff an additional

three times.  In addition to being a use of excessive force, the decision to maximally restrain Plaintiff also violated SDPD procedures which require lesser force options prior to using the maximum restraint technique.

52.   Given the totality of these circumstances, it becomes clear maximum restraints were applied in retaliation for Plaintiff's perceived "contempt of cop" and not based upon the Defendants' fear that she would harm herself.  Indeed, Plaintiff is informed and believes that prisoners are routinely permitted to stand on benches in holding cells while in handcuffs without intervention by SDPD officers.  The fact that Sgt. Cephas ordered such retaliatory behavior not only provides evidence of his own misconduct, but reflects his inability and/or negligence in supervising subordinate police officers.

53.   As set forth above, the SDPD police reports contain several material misrepresentations and omissions.  Knowing of the false and misleading nature of these reports, these SDPD officers, along with Chief Zimmerman and other, currently unidentified final policymakers and supervisors, caused these false and misleading police reports to be submitted to the District Attorney for the County of San Diego ("DA"), insisting that the DA file criminal charges against Plaintiff.

54.   Accepting the police officers' false and misleading reports at face value, the DA filed false charges against Plaintiff.  Defendants motivation in requesting these false charges against Plaintiff undoubtedly stemmed from a desire to prevent Plaintiff from being able to sue them for violating her civil rights pursuant to the holding in Heck v. Humphrey, 512 U.S. 477 (1994) (barring § 1983 claims that would necessarily imply the invalidity of a plaintiff's previous conviction).

55.   Unlike most individuals faced with a "contempt of cop" charge, however, Plaintiff refused to plead guilty.  Instead, she insisted on a jury trial.  As frequently occurs in these types of cases, SDPD officers took to the stand and perjured themselves, while the DA tried to paint Plaintiff as anarchical and disobedient.  The jury saw through it all.  They found Plaintiff "not guilty" on all charges.

56.     An unlawful policy, pattern, and/or custom perpetrated by the SDPD against the general public led to Plaintiff's injuries in this case.  This unlawful policy, pattern, and/or custom involves the unlawful detention, arrest, use of excessive force on, and imprisonment of individual citizens based on personal (including racial, socioeconomic, and political) prejudices.  These detentions, arrests, uses of excessive force, and cases of imprisonment are often accompanied by the hiding or manufacturing of evidence, and the pressing of false charges against these individuals in an effort to coerce them into pleading guilty to some crime, effectively precluding these individuals from later seeking redress for violation of their civil rights.  Plaintiffs will refer to this unlawful policy, pattern, and/or custom as the "abuse and accuse policy."

57.     The uniformity in which nearly ten SDPD employees acted in detaining (without any legal basis) Plaintiff, battering her, arresting her, and insisting that the DA file false charges against her demonstrates the pervasiveness of the abuse and accuse policy.   Indeed, Plaintiff is informed and believes the abuse and accuse policy is approved of and encouraged by the upper echelons of the City administration, beginning with Chief Zimmerman and extending to the City's Manager, Mayor, and Council.

58.     Moreover, Plaintiff is not the first victim of the SDPD's abuse and accuse policy.  A few examples of this practice are illustrative.

59.     On July 3, 2013, a fight broke out in a Hispanic neighborhood in City Heights.  The fight started when Asian gang-members drove through the Hispanic neighborhood, randomly destroying property and attacking residents.  One of the residents of the neighborhood, Brian Hernandez, called 911 to report the incident.  When the SDPD arrived, however, they made no effort to distinguish between the perpetrators and victims and arrested a Hispanic resident who had not committed any crime.  When Mr. Hernandez's mother attempted to tell the arresting SDPD that this resident had not done anything wrong, the officer spoke rudely to her and pushed her away.  When Mr. Hernandez – the individual who called 911 to report the incident in the first place – objected to this treatment and told the officer not to treat his mother so disrespectfully,

the SDPD officer grabbed Mr. Hernandez, assaulted him, and slammed him to the ground.  When Mr. Hernandez's brother, Kevin, objected to this illegal treatment of his brother, another SDPD officer arrested him.  For their "contempt of cop", the Hernandez brothers were taken to jail and held until they were able to post bail.  The SDPD officers requested that the City Attorney filed criminal charges for violation of Penal Code ("PC") § 148.  Although the City Attorney declined to file charges against Kevin, it did file against Brian.  Brian refused to plead guilty, and, ultimately, all charges against him were dismissed.

60.    Brian and Kevin then filed suit against the SDPD, and its officers, for violating their civil rights.  *Hernandez, et al., v. City of San Diego, et al.,* Case No. 14cv0591-GPC (JLB).  The City ultimately paid the Hernandez brothers a substantial amount of money to settle the suit.

61.    In 2014, numerous SDPD officers brutally assaulted Bryan Johnson near a taco shop in San Diego.  To justify their misconduct, the officers alleged that Johnson had assaulted a police officer.  Johnson filed suit, and his case is pending in federal court. *Johnson v. City of San Diego*, Case No. 15cv1039-H (JLB).

62.    On December 3, 2011, Travis Wilkerson was assaulted, and falsely arrested, by two SDPD officers.  The SDPD then arrested Travis' brother, Tyler, his wife, Victoria Garcia, and a mutual friend, Andrew Harlin, and used excessive force against all of them. Both the City Attorney's Office and the DA declined to file charges.  Travis subsequently filed suit against the SDPD officers in federal court. *Wilkerson v. City of San Diego, et al.*, Case No. 12cv2994-WQH (BGS).  In 2014, a federal jury found that the officers had violated Travis' civil rights and used excessive force against him.

63.    On February 17, 2007, an SDPD officer Adam Feilmeier and requested that non-meritorious charges be filed against him.  The City Attorney filed these charges, and the arrested SDPD officer provided false testimony against Mr. Feilmeier.  Ultimately, all criminal charges against Mr. Feilmeier were dismissed, and he subsequently sued the SDPD in federal court. *Feilmeier v. Broxterman, et al.* Case No. 09cv0286-H (NLS).

64.     On February 16, 2007, SDPD officers wrongfully arrested, and used excessive force against, Melford Wilson.  To cover up their misconduct, SDPD officers claimed that Mr. Wilson had violated PC § 148 and requested that the DA file false charges against him.  All charges against Mr. Wilson were dismissed at his first court appearance, and he subsequently filed a successful suit against the SDPD officers in federal court.  *Wilson v. City of San Diego, et al.*, Case No. 09cv0219-JLS (WMc).

65.     As these cases illustrate, the SDPD's "abuse and accuse" policy is not limited to Christina Dorsey.

66.     Here, when confronted with the fact that Officer Hendee, Officer Anderson, Officer Ponce, Officer St. Clair, Officer Hernandez, Officer Esquer, and Sgt. Cephas illegally detained, arrested, and battered young Ms. Dorsey, Chief Zimmerman and other currently unidentified final policymakers for the City, such as the City's Manager, Mayor, Council, and/or other SDPD policy-making defendants, ratified the actions taken against Plaintiff.  The continued encouragement and implementation of – or at a minimum, deliberate indifference to – the abuse and accuse policy by the City's final policymakers and their subordinates demonstrates deliberate indifference to the violation of Plaintiff's, and other individuals', constitutional rights.

67.     Because SDPD officers, supervisors, and final policymakers insisted that the DA file these fraudulent charges, Plaintiff remained in jail for two (2) days before she was able to post bail.  Plaintiff missed work while in jail, which caused her to lose her job.  In addition to violating her constitutional rights and causing her lost wages/employment, Defendants' actions caused Plaintiff physical injury, pain and suffering, prolonged fear for her safety, humiliation, anxiety, worry, and mental/emotional distress.

//
//
//
//

# FIRST CAUSE OF ACTION

## 42 U.S.C. § 1983 – Excessive Force

### (By Plaintiff against Officer Hendee, Officer Anderson, Officer Ponce, Officer St. Clair, Officer Hernandez, Officer Esquer, Sgt. Cepher)

68.   The foregoing paragraphs are incorporated by this reference.

69.   The Fourth Amendment to the United States Constitution states:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

70.   Officer Hendee, Officer Anderson, and Officer Ponce violated Ms. Dorsey's Fourth Amendment rights when they used unreasonable and excessive force against her by grabbing her wrists and arms, twisting Plaintiff's wrists and arms, pulling Plaintiff from the parked car in which she was sitting, forcing Plaintiff to the ground, pressing their knees into Plaintiff's back, punching Plaintiff, and handcuffing Plaintiff.

71.   Officer St. Clair, Officer Hernandez, and Officer Esquer were present during the foregoing uses of force and, knowing any use of force on Plaintiff was excessive, acquiesced in, and failed to take any reasonable steps to stop, Officer Hendee, Officer Anderson, and Officer Ponce from using excessive force on Plaintiff.

72.   Sgt. Cepher, along with currently unidentified SDPD officers, used excessive force on Plaintiff when they maximally restrained Plaintiff in retaliation for insisting they were motivated by racial prejudice and, in this process, delivered additional blows (punches) to Plaintiff's body.

73.   The foregoing uses of force were objectively unreasonable given the absence of any true fact that would give rise to the reasonable suspicion or probable cause that these SDPD officers needed to detain or arrest Plaintiff when they did.

74.   In committing these acts, these defendants acted in the course and scope of their employment and under color of state law.  The rights Defendants violated were

clearly established, and no reasonable officer in Defendants' position could have believed that their conduct was reasonable or lawful.

75.    As a direct and foreseeable result of the foregoing, unreasonable and excessive uses of force, Plaintiff's clearly established rights under the Fourth Amendment were violated, and Plaintiff suffered general and special damages, including those arising from physical injury, pain and suffering, extreme emotional distress, prolonged fear and post-traumatic stress, humiliation, lost employment and wages, and further damages according to proof at the time of trial.

76.    Officer Hendee's, Officer Anderson's, and Officer Ponce's unreasonable and excessive uses of force on Plaintiff were oppressive, malicious, and in reckless disregard of Plaintiffs' rights.  As such, these SDPD officers' actions justify an award of punitive damages in an amount to be determined at the time of trial.

## SECOND CAUSE OF ACTION

### 42 U.S.C. § 1983 – Unlawful Seizure, Detention, and Arrest

### (By Plaintiff against Officer Hendee, Officer Anderson, Officer Ponce, Officer St. Clair, Officer Hernandez, Officer Esquer)

77.    The foregoing paragraphs are incorporated by this reference.

78.    Officer Hendee, Officer Anderson, Officer Ponce, and Officer St. Clair unlawfully detained and arrested Plaintiff after refusing to respect her decision not to engage in a consensual encounter, insisted that Plaintiff follow their commands to exit the car, placed Plaintiff under guard in the car she was sitting in, grabbed Plaintiff's body to pull her from the car, kneeled on and punched Plaintiff into submission, handcuffed Plaintiff, and transported Plaintiff to jail.

79.    Officer Hernandez and Officer Esquer were present when the foregoing seizures occurred, and knew any detention was unsupported by reasonable suspicion or probable cause.  Officer Hernandez and Officer Esquer acquiesced in, and failed to take any reasonable steps to stop their colleagues from illegally seizing, detaining, or arresting Plaintiff.

80.     Plaintiff's detention and arrest were objectively unreasonable given the absence of any true fact that would give rise to the reasonable suspicion or probable Officer Hendee, Officer Anderson, and Officer Ponce needed to detain or arrest Plaintiff.

81.     In committing these acts, these defendants acted in the course and scope of their employment and under color of state law.  The rights Defendants violated were clearly established, and no reasonable officer in Defendants' position could have believed that their conduct was reasonable or lawful.

82.     As a direct and foreseeable result of these defendants' actions, Plaintiff's clearly established rights under the Fourth Amendment were violated, and Plaintiff suffered general and special damages, including those arising from physical injury, pain and suffering, extreme emotional distress, prolonged fear and post-traumatic stress, humiliation, lost employment and wages, and further damages according to proof at the time of trial.

83.     Officer Hendee's, Officer Anderson's, and Officer Ponce's unlawful seizures of Plaintiff were oppressive and in reckless disregard of Plaintiff's rights.  As such, these officers' actions justify an award of punitive damages in an amount to be determined at the time of trial.

## THIRD CAUSE OF ACTION

### 42 U.S.C. § 1983 – Monell – Unlawful Policy, Pattern, or Custom
### (By Plaintiffs against City, SDPD, Chief Zimmerman)

84.     The foregoing paragraphs are incorporated by this reference.

85.     In perpetrating the foregoing constitutional violations against Plaintiffs, the individual defendants named herein acted pursuant to a policy, practice, and/or custom of the City and, in particular, of the SDPD – namely, the Abuse and Accuse Policy.

86.     The physical abuse and meritless arrest of Plaintiffs and other citizens is consistent with the Abuse and Accuse Policy, which was and is promulgated, and/or tolerated by the City, the SDPD, Chief Zimmerman and all others with supervisory and/or final policy-making authority.

87.    The Abuse and Accuse Policy was the moving force behind the SDPD officer defendants' violation of Plaintiff's rights on July 20, 2014.

88.    Accordingly, the City is liable for the deprivation of Plaintiffs' constitutional rights under Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978), and its progeny, which hold that a municipal entity may be held liable for, among other things, violations of constitutional rights committed by its law enforcement officers where the violations arose from a widespread practice that, although not authorized by written law or express municipal policy, is "so permanent and well settled as to constitute a custom or usage" with the force of law.

89.    As a direct and legal result of the Abuse and Accuse Policy, Plaintiff's clearly established rights under the Fourth Amendment were violated, and Plaintiff suffered general and special damages, including those arising from physical injury, pain and suffering, extreme emotional distress, prolonged fear and post-traumatic stress, humiliation, lost employment and wages, and further damages according to proof at the time of trial.

### FOURTH CAUSE OF ACTION

**42 U.S.C. § 1983 – Monell – Ratification by Final Policymaker**

**(By Plaintiffs against City, SDPD, Chief Zimmerman)**

90.    The previous paragraphs are incorporated herein by this reference.

91.    Plaintiffs are informed and believe that, when presented with the fact that her subordinates used excessive force in unlawfully arresting Plaintiffs, Chief Zimmerman and other currently unknown supervisors and final policymaker specifically approved of Plaintiff's treatment by SDPD personnel.  That is, Chief Zimmerman knew of, and specifically approved, the actions taken by SDPD personnel against Plaintiff on July 20, 2014.

92.    Accordingly, the City is liable for the deprivation of Plaintiff's constitutional rights under Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978), and its progeny, which hold that a municipal entity may be

held liable for, among other things, violations of constitutional rights committed by its law enforcement officers if the violations arose from the fact that the illegal and unconstitutional conduct was ratified by an individual with final policy-making authority.

93.    Police chiefs like Chief Zimmerman are final policymakers under California law.  Chief Zimmeran's ratification of her subordinates' conduct is therefore attributable to the City under <u>Monell</u>.

**<u>FIFTH CAUSE OF ACTION</u>**

**42 U.S.C. § 1983 – <u>Monell</u> – Failure to Train**

**(By Plaintiffs against City, SDPD, Chief Zimmerman)**

94.    The foregoing paragraphs are incorporated by this reference.

95.    The SDPD's training policies were not adequate to train its officers and/or employees to handle the usual and recurring situations with which they must deal, including, for example: the ability to properly assess whether an individual matches a suspect's description, including the ability to tell the difference between colors of clothing; the ability to properly assess whether the "reasonable suspicion" or "probable cause" necessary to detain or arrest an individual actually exists; the ability to determine whether, and in what amount, force should be used; the ability to refrain from engaging in retaliatory conduct when citizens express personal and political views that may personally offend; the ability to not lie in police reports or on the witness stand; and the ability to refrain from insisting that the DA file false charges with the hope of covering up officer misconduct.

96.    The City and the SDPD – through, e.g., their final policymaker Chief Zimmerman – were deliberately indifferent to the obvious consequences of their failure to adequately train SDPD officers and/or employees.  One such consequence was the rise of the Abuse and Accuse Policy, which policy could not have resulted if the City, SDPD, and Chief Zimmerman had ensured SDPD officers were adequately trained.

//

97.     The failure of the City and the SDPD to adequately train SDPD officers and/or employees caused the deprivation of Plaintiff's rights by the individual SDPD officers named herein.  That is, the failure to train SDPD personnel is so closely related to the deprivation of Plaintiff's rights as to be the moving force that caused Plaintiff's ultimate injuries.

98.     As a direct and legal result of the City's and the SDPD's failure to train their officers and/or employees, Plaintiff's clearly established rights under the Fourth Amendment were violated, and Plaintiff suffered general and special damages, including those arising from physical injury, pain and suffering, extreme emotional distress, prolonged fear and post-traumatic stress, humiliation, lost employment and wages, and further damages according to proof at the time of trial.

## **PRAYER FOR RELIEF**

WHEREFORE, the foregoing allegations considered, Plaintiff demands:

(1)   that judgment be rendered in favor of Plaintiff and against Defendants on all causes of action asserted herein;

(2)   compensatory damages (including economic and non-economic damages), in amounts to be determined at trial;

(3)   punitive damages, against the individual defendants only, in an amount sufficient to deter and make examples out of these individuals, to be determined at trial;

(4)   reasonable attorney fees, expenses, and costs of suit pursuant to 42 U.S.C. §§ 1983-1988 and any other relevant statutory or case law; and

(5)   any and all other relief in law or equity to which Plaintiff may be entitled and which this Court deems just and proper.

//

//

//

//

//

COMPLAINT                                    20

## **DEMAND FOR JURY TRIAL**

Plaintiff demands, under the Seventh Amendment, a trial by jury as to each and every cause of action asserted herein.

SINGLETON LAW FIRM, APC

Dated:  July 1, 2015                    By:    */s/ Gerald Singleton*
                                                        Gerald Singleton, Esq.
                                                        Brody A. McBride, Esq.
                                        Attorneys for Plaintiff, Christina Dorsey